Before we call the last case of the day, for which we've allotted 20 minutes per side, we're going to take a short 10-minute recess. Will we convene at 20 of 12? Okay, so Walter et al. v. Pike County et al., 06-5034, 06-5144, and 07-1668. And I have Mr. Dunahue? Yes, Your Honor. May it please the Court, my name is Michael Dunahue, and I represent Appellant Hattie Lynn Mitchell, the administratrix of the estate of Detective Tim Mitchell. And do you wish to reserve any time for rebuttal? One minute, if the Court pleases. That's fine, sir. Your Honor, this case grows out of the tragic death of Michael Walter, who was murdered by Joseph Stacy the day before Mr. Stacy was scheduled to go to trial for the molestation of two of the Walter children. The issue is... Unfortunately, we've got the facts down here. It's a... Go ahead. It's a tragic case, as so many of these state-created danger cases are, Your Honor. And the issue is whether Detective Mitchell or District Attorney Jacobs and DeSarro violated Mr. Walter's constitutional rights under the theory of state-created danger during the prosecution of Joseph Stacy. And it seems to me that there probably were two incidents that were particularly concerning. One, the involvement of Mr. Walter in the initial arrest. And two, when Detective Mitchell and others knew that there was something really wrong with regard to the actions of Mr. Stacy, that Mr. Stacy had guns in his home and that he had prior convictions, one of which was for killing someone, why there was no warning given to Mr. Walter, be careful, we're going to send out a detail. Let's take those one at a time, Your Honor. The first one was what I'll call phase one of the Walter case, which occurred in August of 2001 at the time of Mr. Stacy's arrest. And Mitchell was the investigating police officer. He made full and complete disclosure to the Walter family of Mr. Stacy's criminal history. And he told them that it is crucially important that I be able to sit down with Joe Stacy and elicit a confession because this was a difficult case without a confession. Mitchell approved a plan after consultation with the district attorney's office that Walter would invite Stacy to the Walter home on a pretext where Mitchell could confront Stacy at a spot where he was somewhat comfortable in the hope that Stacy would make a confession. While we're on that, why would they have involved Mr. Walter in this ruse? Well, there is testimony from Mrs. Walter that he actually suggested it. Stacy and Walter. But even had he suggested it, it's somewhat hard to imagine the police officers allowing someone who is the father of these victims to become involved in a plan to get Mr. Stacy to confess. I mean, have you ever heard of it being done before? Well, there are a myriad of cases, Your Honor, where cooperating witnesses cooperate with the police effort. It's usually a possible defendant who's trying to make sure he gets a good deal later on. It's usually a co-conspirator, a successory who is looking for leniency in the planning. But nobody could be more innocent than Mr. Walter here. And yet, Your Honor, there's only one constitution, and I've seen no case where one rule applies to a co-conspirator or an accessory and one rule applies to everyone else. It's not the history of the cooperating citizen that led every court who dealt with the issue of a third person being involved in a criminal arrest to say, as long as there's full disclosure, there are risks inherent in cooperating with the police in eliciting a confession or getting evidence, whether it is being taken to a place where incriminating evidence exists, whether it is wearing a wire, whether it is getting incriminatory statements. It is not the motivation or the culpable history of that cooperating witness that determines whether it is a violation of the state-created danger case. The cases I've cited are the Velez-Diaz case, where the court recognizes there is an inherent risk in getting involved with the criminal process. The Landmark case, the Walker case, Seventh Circuit, where the first analogy to the snake pit was used, that if a person volunteers and puts himself in the snake pit, and if the police throw the person unwittingly and unwillingly into the snake pit, into the criminal process, that might be a violation of the state-created danger. But when a person, as Michael Walter did, volunteers to become the snake charmer,  Let's segue to the second one, because he didn't volunteer to be in the line of fire. Well, the meeting goes forward. No, I don't mean this one. I mean the second incident. I mean when you got indications. Before we can get there, you do a search of Mr. Stacey's house. You find that the guy has guns. You do a search of his past background. You find that the guy has some very, very troubling incidents that had previously occurred. Why were the guns not confiscated? Here you have a felon in possession of a deadly weapon. During the search, they were, Your Honor. During the search, they took every gun they could find, Your Honor. There was no— Do you know in hindsight where Stacey got his gun from? No, Your Honor. I don't know where he got his gun from. There was an effort on the part of the Pike County authorities to search that property and get every gun. He had them stashed elsewhere. And then you tried to have his bail not lifted. Is that correct? We move forward to Stage 2, Your Honor. Move forward to Stage 2. The week before the trial, the week before the trial, what happened was a citizen by the name of Scott Frazier approached Mitchell and says, Tim, Stacey's asking where you live, where you live. And Mitchell does this. He participates with the DA's office in a petition to have bail revoked, hands it up to Judge Thompson, and it's not granted. Do you know why? What was the reasoning? Yes. There was deposition testimony from Bruce DeSauro as to the court's reservations. All he did was ask one question. Given those standards, is it too much of a jump to say he must have a bad intent, he must be intending violence? There's no evidence at that point that he had a gun. Judge, I wish Judge Thompson had granted it and we wouldn't be here, but he didn't. Was there any warning given at this point in time to Mr. Walter that be on the lookout? No, Your Honor. No, Your Honor, there was not. Mitchell did this. He told Mr. Frazier, go back to Stacey, tell him you don't know where my house is, but he gave him accurate information as to when I leave the county administration building. Mr. Donohue, there also was no threat at that time from Mr. Stacey directed towards Mr. Walter, was there? Absolutely none, Your Honor. The threat was directed, if believed, to Mr. Mitchell or the DA's office? Well, really just Mr. Mitchell. If you take that inquiry as a threat, as reasonably you might. Okay, assuming it was a threat. Assuming it was a threat, it was a threat directed exclusively at Mr. Mitchell. And he told Mr. Frazier to give him accurate information if he wants to talk to me when I leave my county administration building. The very next day, Stacey is parked in his pickup truck. So there was no direct, there was no evidence presented to Judge Thompson that there was a threat made by Mitchell or a threat made by Stacey to anyone? That's correct, Your Honor. The only evidence there was was the inquiry by Mr. Stacey as to where Mitchell lived. And with regard to that, the failure to warn and the failure to protect, only refer the court to the Bright opinion and to the Barella opinion, which was a terribly tragic factual scenario in which Your Honor, Judge Ambrose wrote a concurring opinion with a long diatribe of direct, personal, physical attacks and threats of death. And the court denied the claim for state-created danger because it doesn't apply to a situation where it's failure to protect. In essence, what I hear you saying is on the final prong of state-created danger, there has to be, under our case law and that of the Supreme Court, an affirmative act that, in effect, restrains a person, puts them, in effect, under the custody or protection of the state. And that wasn't done in this case. And while one could argue there was an omission, one could argue there's negligence, one could argue whatever, if that doesn't occur, it's not a substantive due process state-created danger violation. If not in state custody, the act has to increase the vulnerability. The act of the state actor has to make the plaintiff more vulnerable to attack by a third party, not just make that third person angry, but make the victim easier to get to. Stacy knew where the Walters lived. He always knew where Michael Walter worked. I see the red light is on. Let me close with qualified immunity on every step he conferred with the district attorney's office. I would submit not only were these – if these rights existed at all, they were not clearly established, and an officer in Timothy Mitchell's position would not know that he was violating Mr. Walter's constitutional rights. This was the only case in which the lower court – You're saying there was not a clearly established right. Thank you, Your Honor. Thank you. Mr. Geiger. Your Honor, I'd like to reserve one minute in rebuttal time as well. That's fine, sir. May it please the Court, my name is Jerry Geiger. I represent Assistant DA Bruce DeSaro, who's with us in the courtroom today, and also former District Attorney Doug Jacobs. The – as Mr. Donohue said, this is a tragic case, and it's tragic and troubling, actually, not just for the Walter family, but it's also troubling in what kind of a precedent we might be setting for future prosecutors who are confronted with how do we go about prosecuting crime when it involves the cooperation of a witness or of a victim. And the fact is that it's – as I mentioned to Mr. DeSaro before our argument today, it surprises me that prosecutors aren't always in the so-called crosshairs of criminal defendants. Every witness in a crime, every victim, and every prosecutor who prosecutes a crime is putting himself at risk. When did Messrs. Jacobs and DeSaro first learn of the attempt to have the – the victims involved in the plan to get Mr. Stacey to somehow make a statement against his interest? Mr. – the District Attorney Jacobs did not know about any type of a plan until after the arrest was already made. He was not involved in any of the planning. Assistant DA DeSaro spoke to Timothy Mitchell, who was a Westfall police chief officer at the time, and the plan was to cause the arrest to happen at Mr. Walter's home. The plan wasn't let's get a confession out of Mr. Walter or out of Mr. Stacey. And the reason was is that they felt that there was a large cache of guns at the Stacey residence and that to effect an arrest at the Stacey residence might involve a shootout. So what they did was, and Mr. DeSaro personally spoke to the family, said this is what we know about this guy. He's a danger. You know, 40 years ago he killed his girlfriend. This is a man in his mid-70s. He's been known, has a reputation of having guns. And you have to know this before you go forward with the case. Isn't part of the problem here only that obviously Mr. Jacobs claims he knew nothing about the case at all until the charges were filed. Mr. DeSaro claimed he knew only beforehand of a plan to arrest Stacey. But Mrs. Walter, on the other hand, in contrast, she claims that Jacobs and DeSaro knew that they were authorizing a plan to obtain a confession. And on this basis she claims they were acting in their investigative capacity. Isn't that, whether you're right or wrong, isn't that a question of fact? Well, see, first of all, I don't think there's any evidence, even for Mrs. Walter, that D.A. Jacobs had any involvement beforehand. She said in her testimony there was never any conversation between her and the district attorney. I think I'm looking at least on our brief, page 60, she's saying that Jacobs and DeSaro knew that they were authorizing a plan to obtain a confession. That may not be true, but it's putting one side is stating a fact differently than another side. I'm not sure, do we have the authority to wade in when that fact hasn't been resolved? I think if there are certain key factual issues in dispute, then that does involve a trial. And in this case that would be a key fact in dispute, wouldn't it? Yes and no, because I think even if both DeSaro and Jacobs knew that the plan was to elicit a confession, I don't believe a state-created danger claim has been stated here. Because what we were doing is we weren't restricting the right of Mr. Walter to protect himself in any way. He was not coerced. He was a knowing, he was given full information, which they concede occurred, volunteered to have his home used, and knew what he was getting into, as any father would want to prosecute a criminal who molested his daughter. And so it's not surprising that despite knowing all of the bad history of Mr. Stacey, that he wanted to go forward and prosecute this guy, regardless of the rest. And the fact that he did know of the danger, because it's in the record, it shows that he wrote a letter to District Justice Lieberman prior to the preliminary hearing, asking the District Justice, or telling him that he knew this guy could pose a danger to his family, and asking him to deny bail. The District Justice did not do that. But that reflects that they knowingly were aware of what the situation was when they moved in, moved forward with the case. And so you have to ask yourselves as prosecutors then, what is the rule? What can I do with a complaining witness or a victim? If I ever give the criminal defendant notice that they've cooperated in any way, aren't I putting them in the crosshairs? And, therefore, might be constitutionally liable under a state-created danger theory. That creates a serious impediment for prosecutors to move forward and prosecute crime. Because I think what was clearly established was that prosecutors and police always use victims. They necessarily have to use victims and witnesses to prosecute crimes. If we find that Mr. DeSorro and Mr. Jacobs were negligent in approving this plan, is that enough to meet the test of the state-created danger, Doctor? It is not. I mean, you have to go beyond that. If not, why not? Well, first of all, if you look at the four factors in the Bright case, about shocking the conscience type of a standard, the question is if there's a history in law enforcement where you were always using complaining witnesses, you're always using victims as part of your proof to move forward with a case, getting them to identify people in lineups, does that shock the conscience? I mean, the standard is much beyond negligence. I mean, negligence has never been a sufficient basis for establishing any type of conscience. But you seem to be assuming that we would have to write broadly and there would be a huge precedent that would overshadow historic prosecutorial techniques. But I don't understand why you are making that assumption. I guess I'm making the assumption because in this case, what was approved by Mr. DeSorro was to allow the arrest to take place in the presence of a victim. Well, what about the failure to warn? Well, that's okay. And we're at phase two of the issue. Yeah. And on phase two, first of all, quite honestly, the reason that Mr. Walter wasn't brought into this was because everybody thought that he wasn't in the crosshairs. The idea was always that Tim Mitchell was the guy that was the target because of their past history. In fact, the undisputed facts in the record – Past history being what? I'm sorry? Past history being what? Mitchell had arrested him in the past, prior to this particular incident. They knew each other. I mean, there was not the best of blood, so-called, between the two of them. And so the idea was that in the events leading up to the trial, if we knew then what happened, certainly they would have been protected. But the thought was that it was Tim Mitchell that was the target because there was not one bit of evidence that Joe Stacey ever made any type of a threat. Yeah, but consider Joe Stacey's situation. As I understand it, Stacey's incriminating statements are made to Mitchell and Walter, both. Yes. So Mitchell and Walter are likely to be critical witnesses at the trial. As is the doctor. And so if I'm Stacey and I want to avoid conviction, I better kill both of them because only killing one of them won't do me any good. The other will testify to my confession and I'm sunk. So anybody looking at that case would have to surmise that the danger would be equal to both the hearers of the confession. Except looking at it in the context of where no threat was ever made against Michael Walter by Joe Stacey. As Judge Thompson said- The only differentiating fact is the real estate agent wasn't asked where Walter lived because Stacey already knew where Walter lived. So there's no need to ask any real estate agent about that. Well, it goes beyond that because Tim Mitchell believed that Joe Stacey was following him, which is why they were trying to stake out the administration building near the courthouse. Yeah, but nobody's complaining about all the precautions taken to try to protect Mitchell. The question is whether the prosecutors weren't way off base in failing to see that the danger, the motivation would be equal against Walter and that he better be warned as well. But what they were faced with was that there was no evidence that Stacey was going after Walter, which is why when they presented the evidence to Judge Thompson, he said, you've got nothing here. The only evidence that existed was this guy was sitting outside the administration building, which is two doors down from the courthouse. He's sitting in a car near a public building. Mitchell thinks that he's following him, but the judge says I can't revoke bail just because he's seen your public building. And so there was that attempt made, but nobody really believed that Michael Walter was the primary target. What was the thinking? Obviously, looking at somebody with these convictions, violent convictions, somebody who's got all of these guns who shouldn't have any, and he's got 12 or whatever, and something's not right, and then he's acting strange. Was the thought is that we just have a doddering 70-some-year-old man and he's harmless? Or what was the thinking to the extent one can gather what it was? I guess the thinking changed over time. I mean, initially when the arrest was made, they thought rightfully so that he was well-armed, but then they seized all of those weapons. But then they saw the erratic behaviors. They saw the erratic behavior, but there was also other things. I mean, the man also did go to psychiatric counseling as he was ordered to. You say he did or didn't? He did. And 11 months passed between the time of the arrest and the shooting, and nothing happened between Walter and Stacy. And, yes, looking back on it, should we see signs? Yes. But does it rise to a constitutional level? I would suggest not. Remind me what precise remedy you are asking for on behalf of the two prosecutors. We were denied qualified and absolute immunity. The absolute immunity was for the, I had argued to the district court, that when DeSaro told Mitchell to go and make the arrest at the Walter home, that that was the initiation of criminal charges, which is entitled to the argument. So you're saying absolute immunity for both all the way from the day of the confession vote? Well, I think in phase one that's absolute immunity because that was the initiation. I'm not asking about the argument. I'm just asking about the remedy. You seem to be saying absolute immunity for both prosecutors right on through. I mean, I think qualified immunity comes into phase two because that wasn't necessarily. Absolute immunity, I have real questions whether we have appellate jurisdiction. I mean, you've got to have no facts in dispute, and that's down to a matter of law. And I mentioned that there's facts in dispute here. I would suggest that the record doesn't show facts in dispute. But assume, if you'd like, that they knew that there was a confession. I don't think Mr. Orlando is going to agree with that. I think he's still entitled to immunity. Under the Burns test, though, isn't this a stretch to try to gain absolute immunity for either the district attorney or the assistant? Well, first of all, I think, at least for the assistant district attorney, I think this qualifies as the initiation of charges. There was another case, Gleason v. ProBosnick, which was affirmed. It was an opinion by Judge Van Aske in the district court, which was this court adopted his reasoning in full, which explained what initiation means, and the directing of charges to be filed justify the absolute immunity protection. Why isn't this in the pre-charge selection phase of trying to get evidence? No, I'm sorry. I'm not following that one. Well, this has nothing to do with the selection or the proffering of charges. Well, but it did, because the decision was made to cause the arrest. This was not investigated. They weren't going there with the idea that if you get a confession, we'll file charges. The idea was charge the guy. Hopefully, you know, I think Mitchell wanted to get a confession, but they were going to charge him regardless. I mean, the people were already set up at the Stacy home to do the search. Yeah, but I think that the scenario even makes this more into the investigative realm, which would lead to the denial of absolute immunity. Well, it was an argument I raised, but I also believe that qualified immunity applies as well. And your appeal on qualified immunity is from the district court's denial of qualified immunity. It was denied in part and granted in part? Yes. The denial of, let's see, qualified immunity was denied for the phase one part of the case and was granted for phase two. Thank you very much. Mr. Orlando. May it please the court, my name is John Orlando. I represent Mrs. Walter and her children. We are appellees, but also cross appellants. If I may, Your Honor, I heard your instruction to apply. But in this one, do you wish to reserve any time for rebuttal? Just a minute, two minutes. Two minutes would be fine. But you would like me to handle the cross appeal as part of this? Yeah, if you could put it all together. I thought it might go back over the couple of times. Thank you, sir. Thank you. Thank you, Your Honor. So we'll give you two minutes for rebuttal. Thank you. Let me first address one of the questions raised by Your Honor with respect to what I think is mixing apples and oranges. The information given to Mr. and Mrs. Walter concerning Joseph Stacey's background had to do with whether or not the family would press charges because they were concerned about what their daughters would be put through. There is no evidence in this record whatsoever that Mr. Walter was given any information or any warnings with respect to embarking upon this ruse. No one explained to him, I'm sorry, no one explained it? But part of the problem here is that it is a very tough doctrine to, and I think theoretically you can understand the reasons why. You're saying that there's a substantive due process violation of our Constitution with regard to acts of those who are providing security and ultimately to prosecute. And in this case, or in any case, there has to be an affirmative act that, in effect, your liberty is restrained. The State, like in the Neep case, takes custody over a particular person and then doesn't do anything to protect that person. Here, you know, I think of it like all of the cases, whether they be Castle Rock, whether they be Bright, whether they be Borrella, they present really tough circumstances that just tug at your heartstrings. But you've got to have an affirmative act. Where's the affirmative act? The affirmative act is this, Your Honor. Rather than simply arresting this quick-tempered, trigger-fingered gun nut, as he's been described, they, being the defendants, have meetings at the district attorney's office, and there is a question of fact as to who all was involved and to what extent in those meetings. And they come up with a plan, as Tracy Todd has testified and is contained in our brief, we've even quoted his testimony. They come up with a plan to have Michael Walter. But Michael Walter went along with it. Whether it was his idea or not his idea, he went along with it very willingly. Well, there's a question of fact as to that even, Your Honor, as to whether he was duped into going along with it. Because, as I say, there's no record evidence that he was told about the snakes in the snake pit, about all the problems, about the fact that he would become the main witness, that his statement that he had to write would be the focus of the suppression hearing, that it would be given to Joe Stacey and his attorney to work with before the suppression hearing. This was 11 months after the incident. I think he was getting frustrated. I think the record really doesn't help you much here that he was a pretty willing participant, regardless of who originated the idea in this August meeting with Mr. Stacey. Well, there's two issues. Number one, there's a question of fact as to whether he was duped because of the conversation in his presence as to how if they arrest Mr. Stacey, according to proper police procedures, there may be a shootout and there probably would be a shootout is what Mr. Mitchell said. At his home. At his home. At his home. Correct. I'm sorry. I didn't mean to mislead you. At his home. There would be this shootout, and Tim Mitchell may even be one of the people that gets killed, including some of his officers will get killed. So there's a question of fact as to whether Michael would say, well, I don't want that to happen, let me help you, or whether he was led down that path. That's a question of fact as to whether he volunteered or didn't volunteer. And as you said before, I'm not so sure it matters whether they kind of coerced him to volunteer or tricked him to volunteer or duped him to volunteer. He shouldn't have been in that position. And the affirmative act is taking Dad, who was not a witness to anything, and making him the critical witness. And the deprivation of what happens later is they made him more vulnerable. Under the circumstances, doesn't he become a critical witness, not the critical witness? You have a subsequent confession given to Mitchell. Well, there's a dispute about that. There are some admissions made to Mitchell, but the actual confession that he did something wrong to those girls was only made to Michael Walter. And, in fact, even in Mitchell's testimony, Joe Stacey clammed up a little bit when Mitchell came back in.  There were some incriminating statements made only to Mitchell, but the key witness was clearly Michael Walter, who had heard much more. And he was the focus of the suppression hearing, and his statement was the focus of the suppression hearing, which Stacey lost, leading up to, I think Your Honor mentioned that there's an 11-month difference, but 11 months in the life of a lawsuit, life of this case, the question on the 11 months is really the remoteness question. And that really is a foreseeability question. Was it foreseeable at this point in time that Joseph Stacey posed a risk to Michael based on the state act of getting Michael involved in this ruse? And did the state, by getting him involved in that ruse, make him more vulnerable to harm? Even if we found foreseeability. Okay. How do you and would you agree that to meet the second prong of the State Created Danger Doctrine, you have to show that the conduct of the defendants shocked the conscience? Absolutely. Okay. How can you show in this case deliberate indifference, which is the test which I believe needs to be shown? Not negligence, not intentional act, but deliberate indifference. How can you show that here? Well, how does this become deliberate indifference? I think it becomes deliberate indifference by having Dad get involved in this ruse, by having him make a call to the person that Joe Stacey is. They know who Joe Stacey is. They know his background. They know his record. They know what they're afraid of with respect to him. But even, you know, notwithstanding maybe the fact that there are some disputed facts about his, Mr. Walter's, willingness to participate, there was at least some indication and there are some facts that he had some willingness to participate. Okay? Will you grant that? Maybe will you grant that? I think he was duped into agreeing to make the call. But there was at least some willingness to participate in this. And there's absolutely no doubt, Your Honor, that he wanted to press charges on behalf of his girl. Okay. Under that factual background, how was the recommendation by the Assistant DA, and let's assume that the district attorney knew you say there's a disputed fact as to whether he knew or he didn't know. Let's assume he knew. How does their recommendation, as well as Mitchell's recommendation, amount to deliberate indifference? Because it is such an egregious departure from law enforcement practices. I mean, I hate to cite the E case, but I can handle the E case. But there you looked at expert testimony. And the expert testimony in the E case showed that the Buford causation had showed that it was way beyond. And what the police did here and what the district attorneys did here by having Dad get involved in this ruse is so far to the left of any accepted police practice that it shows deliberate indifference, especially in light of Stacy's history and their knowledge of Stacy's history. Counsel, can you help me understand? I was not really satisfied by your answer to Judge Ambrose's question about what the act was. And then you shifted to the cases talk about where the government takes control or uses coercive powers against somebody. We don't seem to have anything close to that here. Then you shifted to saying, well, the act was getting him involved. And then you talked about being duped into making a phone call. And I'm not following these colorful language. Is there any testimony that the police official, Mitchell, forced or coerced or claimed a right to require your client to participate, to make the phone call, to help with the arrest, help with the confession? Where is there an assertion of public authority that you have to do this? No choice. You must do this. I don't see that. Is that in here somewhere? No. Here's my answer. I don't mean to be colorful. I've never been accused of that in the past. But here's the affirmative act, and I hope I answer your question. The affirmative act is the meetings at the district attorney's office in which they decide to have Michael Walter get involved. Now, after they make that decision. Yeah, but when you say have him get involved, they asked him to be involved. He seems to have agreed. My sense of it is fairly readily and for some understandable motives because it might minimize the testimony that the daughters would have to make if there is a confession. So I just don't see coercive powers being brought to bear on your client. No, I think the question of fact is what happens next after the decision is made by the defendants to have Michael Walter get involved. And the question of fact is what was presented to him. We have no evidence that he was explained any of the risks or told anything about what to expect. There's no reason why he was even left to remain at the kitchen table when Joseph Stacy arrived. So there's more to it than just having him make this phone call. There's more to it in that he was allowed to stay there. And then once there, he's asked in the presence of Stacy, do you want to talk to Joe Stacy? And he's asked at the end of the conversation, do you still want to press charges in the presence of Joe Stacy? I think the affirmative acts are getting him involved without filling him in on what to do or what to expect and the risks that are involved. And then later on not warning him when those risks were clearly apparent and foreseeable. Why weren't the risks obvious? Well, Your Honor, I don't. He was told about the prior record. He was told later about the seizure of all the guns. He's known this man for years. He knows something about his personality. So why isn't the risk facing Mr. Walter obvious to Mr. Walter at every step of the way? Well, remarkably, his background was not known to Mr. Walter, but that's not, I don't think, critical to your question, Your Honor. So I think the answer to your question is this. If simply, if the case simply were dad was not involved in this ruse, he was not involved in lying to Mr. Stacy to get him out of his house, if dad did not become the focus, as was Mr. Mitchell, in what Mr. Stacy viewed as a trick and a trap to set him up, if dad was not involved in that, dad, as well as the two daughters who were the victims, and maybe mom as well, would be generalized, would be general victims, would be generally, I guess, at risk that Stacy would do something to them. But that's not the facts here. The facts here are that the affirmative act of the State put Michael Walter in the snake pit at the crosshairs by having him be the guy that makes the phone call. So the increase, they made him more vulnerable to an ambush by putting him in that position. But how would they know? Let's assume you're right. How would they know, on the second prong of the Saucier v. Katz test, that this was a clearly established right of a citizen that they were violating? Based on the case law, it's almost impossible for them to know. In fact, it would be. You're not going to find any case directly on point, but that's mentioned in all of your cases. What you need to show is that the contours of the right were clearly known. And the contours of the right here, and I even had a quote here if I can find it, that you can't place a private citizen into some predicament, into some dangerous situation, and be aware that there's a risk of harm that you triggered, that you created. And that's what the State did here. They had to be aware that not only Tim Mitchell was at risk, but that Michael Walter was at risk. There were only two people at the kitchen table when that ruse went down. And to answer your question, the contours of the right were well established back in 1998, I think the Rivas case mentioned. Now, here we are in 2001, and they're putting dad in this position. Rivas, you've got medics and police officers coming in and taking control of the situation and restraining a person's ability to move. Where's the restraint here? The restraint here is in not telling Michael Walter that he has been made more vulnerable to ambush because they got him involved in the ruse. Had Michael Walter been told there were multiple back doors to the showroom where he was sitting at the time Stacy walked in? When Stacy walked into the showroom, the record evidence is that Michael Walter was with a customer. Another salesman even went up to Joseph Stacy and offered assistance, and Joseph Stacy said, no, I'm waiting for Michael Walter. There was a period of time when Stacy was waiting until he got too anxious to wait anymore and began his shooting. So the ambush or the making more vulnerable is sufficient, and that satisfies the problem. You know, all of these cases, Mr. Orlando, are very, very fact-intensive, all of our state-created danger cases. And, you know, what you're trying to paint here is a situation where the law enforcement officers brought Mr. Walter into a case where he literally had no involvement. That's not the case here. Whether Walter was at that initial confrontation or not, charges would have been filed against Stacy for sexually assaulting two of Walter's children. And as Stacy found out at that time, he said, you mean Walter wants to press charges? Okay. It wasn't he wants to press charges and use my admission. He wants to press charges. So how can you segregate all of those facts and say that the risk to Walter came exclusively from the fact that they had him confront Stacy about the conduct? The risk came from the ruse, Your Honor, according to this record. I mean, you're saying it came from the ruse, but how can you separate the ruse using your word from all of the other attendant facts, which clearly had to play into Stacy's state of mind? Because we have Joseph Stacy complaining at the suppression hearing and calling it a trick and a trap. We have Joseph Stacy's note that he left to Agnes saying that I have to get these people that set me up. We have the only two who were being targeted being Tim Mitchell and Mr. Where's your proof of targeting? He was killed, Your Honor. He was killed. Unfortunately. But where's your proof of targeting? It's foreseeable that he would be a target. And as one of Your Honors mentioned, Joe Stacy knew where Michael Walter lived. He knew where Michael Walter worked. He did not know where Tim Mitchell lived. So he asks these questions, and you can foresee that he's targeting Mitchell. It's certainly foreseeable that if he's targeting Mitchell, who is a law enforcement officer who wears a gun, who wears a bulletproof vest, who works next door to the sheriff's department, which is full of people who wear guns, if Joe Stacy is going to target Tim Mitchell, the only other person that was the subject of the ruse or that was a participant in the ruse, who was at the kitchen table, who was the focus of the suppression hearing, who was the focus of Joe Stacy saying, You set me up, is Michael Walter. So I separate and I say to you that the ruse is the state action that made Michael more vulnerable because of the actions of Joe Stacy and what we know from the record. Mrs. Walter wasn't targeted. The two children weren't targeted. No other member of the Walter family was targeted. Yeah, there's always a risk. As counsel said, and I think Judge Michelle had mentioned, I'm not asking you to write broadly. I'm not suggesting to you that anyone who becomes a witness or any dad who presses charges in this circumstance, which you would want any dad to do, all of a sudden is owed certain protections. Your argument is essentially that it was foreseeable that Stacy was going to go after all of these potential witnesses against him. Isn't that really your argument? No, I think it's only foreseeable he's going to go after the person in the ruse because that had been the subject of his complaints. The problem here wasn't even foreseeable to Judge Thompson. Looking at later on, many months later, after the August arrest, we're in late June, early July. I mean, you could argue that he made a significant mistake and you wished he had done something different, but that wasn't even apparent to him, and he was an independent third party. I'm sorry. That was when they revoked the bail. Well, Your Honor, I have some quibbles with that, and there are some questions of fact about that. Well, everybody has quibbles with that, unfortunately. If you give me – oh, I'm out of time. No, go ahead. May I answer the question? Yeah. A bail revocation motion was never filed. The defendants walked up to Judge Thompson in the ante room while he was involved in a different trial and spoke to him with papers in hand, and the record says – Judge Thompson says, I don't think you have anything here, but if you file it, we're having a full hearing on Friday. And Tim Mitchell wasn't going to be in town on Friday. Nothing was ever filed. There was never any hearing. Given the brief encounter that was had, I'm not criticizing Judge Thompson. Where was Mitchell on Friday on vacation? He had planned to leave for vacation, and, in fact, he was told to leave early so he would alter his routine. Michael was never given that opportunity to alter his routine. That's why he left early. I mean, I have no criticism to Judge Thompson. I mean, 2020 is always hindsight – you know, hindsight is always 2020. But he wasn't given – there was no hearing. He wasn't given enough to – Well, all they had was Stacy looking for Mitchell's address. Well, as Your Honor said, that's probably a threat. Maybe it's not. Maybe there wouldn't have been enough. But we will never know because there never was a hearing. There never was a – Well, but if those are all the facts, if those are all the facts, that once again goes to the foreseeability issue. Well, it's clearly foreseeable by their own action, Your Honor. They discussed whether to warn Michael. They knew there was a risk to Michael because the DA and the assistant DA discussed, and when they had time to deliberate, and that's what goes back to a deliberate indifference standard, they had time to talk about do we warn Michael. And, in fact, on the very day that Michael was killed, Mr. DeSavio calls the local chief of police and says, you better ride past there knowing full well that Stacy – it was clearly foreseeable to them that Michael Walter – they didn't say protect Susan Walter. They didn't say protect Judge Thompson. They knew it was Michael Walter. By their own actions, it's foreseeable by their own conduct. Thank you very much. Thank you, Your Honor. Thank you. Mr. Donahoe. Your Honor, I think the issues are in focus. With regard to Tim Mitchell's leaving Pike County, he did have a Fourth of July weekend camping trip, but if the court had scheduled a hearing, Tim Mitchell would have been there. I don't think there's any suggestion in the record that the hearing and a bail revocation proceeding did not go forward as a result of Tim Mitchell's travel plans. I mean, he was wearing a vest, walking out, facing the fire on July 3rd. He would have been there if a hearing had been scheduled. And the other thing, with regard to the interplay between state-created danger and qualified immunity, I think Chief Judge Becker's opinion in Smith v. Mascaro, cited and quoted on page 25 of my brief, is instructive to the court. Okay. Thank you very much. Thank you. Mr. Geiger. Judge, as tragic as every one of these state-created danger cases is, the courts have always applied a very hard rule. And one of the things that they . . . or a couple of things they've looked at is, first of all, that Mr. Walter was a willing participant in this. We didn't restrict his movement. We didn't do anything that interfered with his right to protect himself. Those are all factors that the courts have looked at before. And with respect to those issues, I think that we're in line with the cases that would not find a state-created danger claim. The other thing I just want to mention is that prosecutors frequently use wires to get to illicit confessions. That means they're bringing people into the crosshairs of a criminal defendant. And I would suggest to you that that situation is not fundamentally different than what we have here. And so I believe it was not clearly established that this was a violation. Thank you. Thank you. Mr. Orlando. At this point, as I understand it, Your Honor, I'm to speak only about our cross-appeal. And the only point that I can raise, and I think it is better written in our brief than I could probably say verbally, but we don't see why the judge on his own kind of split this into two and came up with this idea to deny qualified immunity, which we think correctly was done with respect to the Roos, but then granted for not giving a warning after they had time to talk about giving that warning to Michael Walter, after they did multiple things to protect the other participant, the Roos. And the actual quote from the opinion from the court below is in our brief, and it's just wrong. It's contrary to the facts. The judge thought that they were not active law enforcement personnel. That's true. The DAs are not active law enforcement personnel, I guess, but you don't have to be that. You have to be a state official. And secondly, he says they were not in a position to directly know about the increasing threat. And they were, and they discussed it, and they were part and parcel of the state police presence, this thing. So I'm kind of baffled by that, and I think he just at the end of the race there got a little slowed down, and that's the subject of our cross-appeal. Thank you very much. Thank you to all counsel for a very well-presented oral argument. We'll take the matter under advisement.